EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Osbiel Carmona Rodríguez<br><br>Peticionario | Certiorari<br><br>2026 TSPR 87<br><br>218 DPR ___ |

Número del Caso: CC-2026-0538

Fecha: 7 de agosto de 2026

Tribunal de Apelaciones:

    Panel I

Representante legal de la parte peticionaria:

    Lcda. Mariana Miranda Juarbe
    Sociedad para Asistencia Legal

Materia: Resolución del Tribunal con Voto particular de conformidad y Voto particular disidente.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Osbiel Carmona Rodríguez<br><br>Peticionario | CC-2026-0538 | *Certiorari* |

Sala de Verano integrada por el Juez Asociado señor Colón Pérez como su Presidente, la Jueza Asociada Rivera Pérez y el Juez Asociado señor Candelario López.

RESOLUCIÓN

En San Juan, Puerto Rico, a 7 de agosto de 2026.

Atendida la *Moción en auxilio de jurisdicción y solicitud de paralización de los procedimientos* y la Petición de *certiorari*, presentadas por la parte peticionaria, se provee no ha lugar a ambas.

**Notifíquese de inmediato.**

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal Supremo. La Jueza Asociada Rivera Pérez emitió un Voto particular de conformidad al cual se une el Juez Asociado señor Candelario López. El Juez Asociado señor Colón Pérez emitió un Voto particular disidente.


Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Osbiel Carmona Rodríguez<br><br>Peticionario | CC-2026-0538 | |

Voto particular de Conformidad emitido por la Jueza Asociada Rivera Pérez, al cual se une el Juez Asociado señor Candelario López.

En San Juan, Puerto Rico, a 7 de agosto de 2026.

## I.

El 10 de octubre de 2025, por hechos alegamente acaecidos el 7 de julio de 2025, el Tribunal de Primera Instancia determinó la existencia de causa probable para acusar al Sr. Osbiel Carmona Rodríguez (acusado o peticionario) por violación al Art. 401 A (2) de la Ley de Sustancias Controladas, Ley Núm. 4 de 23 de junio de 1971, 24 LPRA sec. 2401, y al Art. 198 del Código Penal, 33 LPRA sec. 5268. El Ministerio Público presentó las correspondientes acusaciones.

Sin embargo, el 30 de diciembre de 2025, el peticionario presentó una moción de supresión de evidencia al amparo de la Regla 234 de Procedimiento Criminal, *infra*. En síntesis, adujo que la evidencia fue incautada en un registro ilegal

por no mediar una orden judicial previa y que las declaraciones prestadas por el agente interventor, Andrés Espinal Torres (en adelante, agente Espinal Torres), eran insuficientes en derecho a tenor con las doctrinas de testimonio estereotipado y evidencia a plena vista.

El 9 de febrero de 2026, el Tribunal de Primera Instancia celebró la vista de supresión de evidencia; el único testimonio presentado por el Ministerio Público fue el del agente Espinal Torres. La defensa, al contrainterrogar al testigo, presentó tres declaraciones juradas, cada una de las cuales correspondía a una intervención distinta del agente Espinal Torres en casos independientes. El propósito era establecer un alegado patrón de declaraciones sustancialmente similares las cuales constituían, a su juicio, prueba de que su testimonio era estereotipado. A saber, que en las alegadas cuatro intervenciones las personas imputadas estaban cometiendo actos ilegales a plena vista y que, al verlo, le expresaron una variación de la frase "flaco, ¿cuánto necesitas?" al momento de la transacción.

El 4 de marzo de 2026, el foro de instancia emitió una *Resolución* mediante la cual declaró No Ha Lugar la moción de supresión de evidencia. En esta, realizó las siguientes determinaciones de hechos:

> El mismo testificó, que el 7 de julio de 2025, a eso de las 6:00 de la mañana tomó servicio en la División de Drogas Metropolitana, y el Sargento Héctor Vélez le impartió instrucciones de realizar vigilancias e intervenciones en el área de San Juan, en específico en Santurce.

A esos fines, se le informó que él iba a ser el conductor del vehículo confidencial que le fue asignado y que el pasajero iba a ser el Agente Ricardo Martínez Natal (en adelante "Agente Martínez Natal"). Se le informó que su vehículo iba a ser el "puntero", es decir, el que realizaría la vigilancia y realizaría la intervención inicial.

El Agente Espinal Torres indica que a eso de las 4:47 p.m. aproximadamente hizo entrada a la Barriada Figueroa en ropa civil. El Agente Espinal Torres narra que estacionó su vehículo a la izquierda en la Calle Roosevelt.

El Agente Espinal Torres indica que en ese momento comienza la vigilancia en la intersección entre la Calle Roosevelt Y la Calle Blanca, a 10 o 15 pies del conocido punto de drogas que ubica en dicho lugar. Pasados varios segundos, el Agente Espinal Torres logra observar a un individuo alto, de pelo corto negro, trigueño, con una camisilla blanca, y unos pantalones cortos azul y rojo, el que en su mano izquierda sostenía una bolsa plástica transparente la cual contenía en su interior bolsitas plásticas con polvo blanco de aparente cocaína. El Agento Espinal Torreo indica que dicha bolsa plástica transparente era grande.

El Agente Espinal Torres narra, que el Agente Martínez Natal le confirmó que había observado al individuo con las sustancias controladas, por lo que procedió a comunicarse con el Sargento Vélez, para indicarle que ya tenía motivos fundados para intervenir. Según el Agente Espinal Torres, este procede a dar reversa al vehículo en dirección a la Calle San Rafael.

En específico, se estacionó en el lado derecho frente a un edificio con un estacionamiento privado.

En ese momento, el Agente Espinal Torres sostiene que procede a comunicarse con el Sargento V[é]lez, a quien le indica que le diera 30 segundos para intervenir. Posterior a esto, el Agente Espinal Torres narra que procede a bajarse del vehículo, caminando hacia la Calle Roosevelt, doblando a la mano izquierda hacia la Calle Blanca.

E1 Agente Espinal Torres explica que cuando llegó a la Calle Blanca, va caminando hasta la esquina, donde se encuentra con el individuo que había

observado previamente con la bolsa conteniendo sustancias. El Agente Espinal Torres indica que, al llegar a uno o dos pies de dicho individuo, este le manifiesta "flaco, cuanto necesitas."

El Agente Espinal Torres procede a identificarse, indicándole, que va a proceder a arrestarlo, a lo que el individuo responde tirándole la bolsa con sustancias en el rostro. Según narra el Agente Espinal Torres, acto seguido el individuo comienza a correr hacia la Calle San Rafael. Según indica el Agente Espinal Torres, en ese momento procede a ocupar la videncia y le da persecución al individuo, sin perderlo de vista.

El Agente Espinal Torres explica que logra observar al individuo doblando hacia la Calle San Rafael, precisamente hacia el lugar donde se encontraba el vehículo confidencial. En ese momento, el Agente Espinal Torres manifiesta que pudo observar al Agente Martínez Natal, al. que le indicó que arrestara al individuo.

En ese momento el Agente Espinal Torres explica que el individuo, brincó el bonete del vehículo confidencial y procedió a brincar una verja, llegando al estacionamiento privado. [É]l procede a darle seguimiento, notando que el Agente Martínez Natal logró arrestar al individuo.

El Agente Espinal Torres relata que en ese momento pone bajo arresto al individuo, le verbalizó las advertencias y ocupó un celular y dinero en efectivo ascendente a $87.00.

Explica el Agente Espinal Torres que procede a dirigirse a la División de Drogas Metropolitana, donde le solicitaron los datos generales al individuo.

El Agente Espinal Torres relata que contabilizó la evidencia, la cual consistió en 42 bolsitas de polvo blanco granulado de cocaína.

El Agente Espinal Torres indica que realizó la prueba de campo a la evidencia, y la misma arrojó positivo a cocaína.[1]

---

[1] Véase Anejo IV, pág. 18 del apéndice del recurso de *certiorari*.

En base a esta declaración testimonial, el foro de instancia razonó que la única coincidencia entre las tres declaraciones era la referencia al agente Espinal Torres como "flaco", lo cual respondía simplemente a su complexión física. Asimismo, expuso que no resultaba extraño que, "en un punto de drogas", el vendedor le pregunte al potencial comprador que "cuanto necesita". Por consiguiente, concluyó que el Ministerio Público cumplió con su carga probatoria a favor de la legalidad y razonabilidad de la intervención del agente Espinal Torres.

El 18 de marzo de 2026, el peticionario solicitó la reconsideración del referido dictamen. No obstante, previa oposición del Ministerio Público, el 15 de mayo de 2026 el foro de instancia declaró No Ha Lugar la moción de reconsideración. Inconforme, el peticionario presentó un recurso de *certiorari* ante el Tribunal de Apelaciones el 16 de junio de 2026. El 25 de igual mes y año dicho foro declinó su intervención con el dictamen recurrido, por razón de que dilataría los procedimientos y que el peticionario podía levantar dicho planteamiento en apelación, de obtener una determinación adversa.

Ante ello, el 16 de julio de 2026, el peticionario presentó ante nos un recurso de *certiorari*, en el cual señala que erró el Tribunal de Apelaciones al negarse a intervenir con la determinación del Tribunal de Primera Instancia de no suprimir la evidencia ocupada sin orden judicial previa. En esencia, argumenta que el Ministerio Público no derrotó la

presunción de ilegalidad que cobija a toda incautación realizada sin autorización judicial previa, pues descansó en el testimonio estereotipado del agente Espinal Torres. A su vez, señala que la prueba demostró que el agente Espinal Torres declaró de forma sustancialmente idéntica en cuatro casos distintos y que su testimonio se limitó a establecer los elementos mínimos del delito para justificar la intervención sin orden judicial. A su juicio, ello imponía al foro primario el deber de evaluar la credibilidad del testimonio conforme a los criterios establecidos por este Tribunal para este tipo de prueba, análisis que, según aduce, nunca se realizó. En consecuencia, sostiene que el Ministerio Público no acreditó excepción alguna al requisito constitucional de orden judicial previa y que, por ende, la evidencia ocupada debió ser suprimida.

Luego, el 3 de agosto de 2026, el peticionario compareció mediante moción en auxilio de jurisdicción, solicitando la paralización de los procedimientos hasta que esta *Curia* hiciera el pronunciamiento correspondiente en torno a la petición de *certiorari*. En esta, el peticionario reitera que el foro intermedio erró al rehusar intervenir con la *Resolución* del Tribunal de Primera Instancia, por entender que era una determinación claramente errónea en derecho. Asimismo, plantea que la etapa en que se presenta el recurso es la más idónea para revisar la controversia, por cuanto permitir que continúe el proceso penal y se someta al acusado a un juicio fundado en una intervención que se

presume ilegal sería un fracaso a la justicia y al propósito de los mecanismos de intervención interlocutoria. El juicio está señalado para el 10 de agosto de 2026.

Evaluados los referidos planteamientos, una mayoría de este Tribunal decidió declarar No Ha Lugar la moción de auxilio de jurisdicción y denegar la expedición del recurso de *certiorari*. Por el presente, expreso mi conformidad con dicha determinación. Sin embargo, huelga precisar los fundamentos que guiaron nuestro curso decisorio.

## II.

La Cuarta Enmienda de la Constitución de Estados Unidos y la Sec. 10 de la Constitución de Puerto Rico, LPRA, Tomo 1, protegen el derecho del pueblo contra registros, incautaciones y allanamientos irrazonables. Como norma general, antes de efectuar un registro o allanamiento el Estado debe obtener una orden judicial, so pena de que la inobservancia de tal exigencia active la presunción de que la actuación gubernamental ha sido irrazonable e inconstitucional. *Pueblo v. Báez López*, 189 DPR 918 (2013). La evidencia que el Estado obtenga en violación a estas disposiciones no será admitida en los tribunales. *Pueblo v. Rivera Surita*, 202 DPR 800 (2019). Ahora bien, existen situaciones excepcionales en las que no es indispensable la orden judicial previa y así lo hemos reconocido jurisprudencialmente. En *Pueblo v. Báez López*, *supra*, detallamos alguna de estas circunstancias, a saber, 1) cuando no existe una expectativa razonable de intimidad 2) un

registro incidental a un arresto legal, 3) un registro consentido voluntariamente de forma expresa o implícita, 4) un registro en situación de emergencia, 5) una evidencia ocupada en el transcurso de una persecución, (5) una evidencia a plena vista, (6) cuando el agente del orden público obtiene conocimiento de la existencia del material delictivo por el olfato, (7) una evidencia arrojada o abandonada, entre otros. Íd., págs. 930-931. Véase, además, *Pueblo v. Apolinar Rondón*, 2025 TSPR 113, 216 DPR __ (2025); *Pueblo v. Álvarez De Jesús*, 214 DPR 753, 767 (2024); *Pueblo v. Diaz, Bonano*, 176 DPR 601, 623 (2009).

Además, es meritorio destacar que la Regla 11 de las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, permite que un funcionario del orden público realice un arresto **sin una orden judicial cuando tenga motivos fundados para creer que el detenido ha cometido un delito en su presencia** o que ha cometido un delito grave. En cuanto a el concepto "motivo fundado" hemos indicado que es aquella información o aquel conocimiento que conduce a creer que el arrestado ha cometido un delito, según la persona ordinaria y prudente. *Pueblo v. Serrano Reyes*, 176 DPR 437, 444 (2009). Véase, además, *Pueblo v. González Rivera*, 100 DPR 651 (1972). Igualmente, este requerimiento no impide que varios agentes del orden público actúen en forma coordinada y concertada en la investigación de un crimen, de manera que sus conocimientos individuales sean un conocimiento colectivo y suficiente.

*Pueblo v. Serrano Reyes*, *supra*. Véase, además, *Pueblo v. Martínez Torres*,120 DPR 496, 502 (1988).

De otra parte, el mecanismo procesal para reclamar la referida protección constitucional es el que dispone la Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II. A esos efectos, la Regla 234, Íd., establece lo siguiente:

> La persona agraviada por un allanamiento o registro ilegal podrá solicitar del tribunal al cual se refiere la Regla 233 la supresión de cualquier evidencia obtenida en virtud de tal allanamiento o registro, o la devolución de la propiedad, por cualquiera de los siguientes fundamentos:
>
> (a) Que la propiedad fue ilegalmente ocupada sin orden de allanamiento o registro. […]
>
> En la moción de supresión de evidencia se deberán exponer los hechos precisos o las razones específicas que sostengan el fundamento o los fundamentos en que se basa la misma. El tribunal oirá prueba sobre cualquier cuestión de hecho necesaria para la resolución de la solicitud y celebrará una vista evidenciaria ante un magistrado distinto al que atenderá el juicio […]
>
> El tribunal vendrá obligado a celebrar una vista evidenciaria con antelación al juicio, y ante un magistrado distinto al que atenderá el juicio, cuando se trate de evidencia incautada sin previa orden judicial si en la solicitud la parte promovente aduce hechos o fundamentos que reflejan la ilegalidad o irrazonabilidad del registro, allanamiento o incautación. El Ministerio Público vendrá obligado a refutar la presunción de ilegalidad del registro o incautación y le corresponderá establecer los elementos que sustentan la excepción correspondiente al requisito de orden judicial previa.
>
> De declararse con lugar la moción, la propiedad será devuelta, si no hubiere fundamento legal que lo impidiere, y no será admisible en evidencia en ningún juicio o vista. […]

En la vista evidenciaria el juzgador aquilatará la prueba testimonial, así como la documental, que el Ministerio Público presente para refutar la presunción de ilegalidad del registro o de la incautación. El exceso más acentuado en la prueba oral que ofrece un agente del orden público es el llamado "testimonio estereotipado". Este es definido como aquel que se ciñe a establecer "los elementos mínimos necesarios para sostener un delito sin incluir detalles imprescindibles para reforzarlos". *Pueblo v. Camilo Meléndez*, 148 DPR 539, 558 (1999), citando a *Pueblo v. Rivera Rodríguez*, 123 DPR 467, 480 (1989). A su vez, la "convicción no puede fundarse en el testimonio único del agente encubierto cuando la declaración se limita a relatar los particulares mínimos para establecer la infracción". *Pueblo v. Álamo Álamo*, 116 DPR 673, 676 (1985). En ese sentido, hace varias décadas delimitamos los siguientes criterios para evaluar la credibilidad de un testimonio estereotipado:

1. Debe ser escudriñado con especial rigor.

2. Tanto los casos de "la evidencia abandonada" o de "lanzada al suelo" como los casos del "acto ilegal a plena vista" deben, en ausencia de otras consideraciones, inducir a la sospecha de la posible existencia de testimonio estereotipado.

3. Cuando el testimonio es inherentemente irreal o improbable debe rechazarse.

4. El testimonio estereotipado puede perder su condición de tal si, yendo más allá de los datos indispensables para probar los requisitos mínimos de un delito, se le rodea de las circunstancias en que funciona el agente, el término de su investigación, los resultados obtenidos fuera del caso en trámites y otros detalles.

5. La presencia de contradicciones o de vaguedades en el testimonio debe tender a reforzar el recelo con que hay que escuchar esta clase de declaraciones. *Pueblo v. Camilo Melendez*, 148 DPR 539, 559 (1999). Véase, además, *Pueblo v. Acevedo Estrada*, 150 DPR 84 (2000).

Como indiqué, existen situaciones excepcionales en las que no es indispensable la orden judicial previa. Dentro de estas circunstancias se encontrar el ocupar evidencia delictiva por estar a plena vista. Al respecto hemos pautado que ello no implica automáticamente que se trate de un testimonio estereotipado que torne ilegal su ocupación si éste no es irreal o inverosímil. *Pueblo v. Espinet Pagán*, 112 DPR 531 (1982). A esos fines, precisamos en *Pueblo v. Espinet Pagán*, *supra*, págs. 537-538, lo siguiente:

Un testimonio honesto no puede calificarse de estereotipado por el simple hecho de que exponga unas realidades fácticas que puedan formar parte del comportamiento usual y de las reacciones de algunas personas al confrontarse con agentes del orden público.
[…]
La dinámica de la conducta delictiva, aunque diferente en sus protagonistas, medios y en un sinnúmero de circunstancias, presenta en el fondo características básicas comunes. **Lo importante es detectar cuándo esas discrepancias, producto de las diferencias humanas, están presentes en determinada actuación.** (Negrillas suplidas).

Por último, en nuestro ordenamiento damos deferencia a la apreciación de la prueba testifical que realiza el juzgador de hechos. Al ser una tarea llena de elementos subjetivos, dicho foro es está en mejor posición para aquilatarla. *Pueblo v. Rivera Montalvo*, 205 DPR 352 (2020). Además, "[e]s el Tribunal de Primera Instancia el que tuvo

la oportunidad de oír y ver el comportamiento de la testigo. Por ello, cuando la evidencia directa de un testigo le merece entero crédito a este, ello es prueba suficiente de cualquier hecho". *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 917 (2016). Véase, además, *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771-772 (2013). Por ello, "como norma general, los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza ese foro". *Pueblo v. Rivera Maldonado*, *supra*, pág. 373. Sin embargo, esa discreción no es irrestricta, "[l]os tribunales revisores podremos sustituir el criterio que utilizó el foro primario por el nuestro únicamente cuando existen circunstancias extraordinarias en las que se pruebe que el foro primario actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción o en error manifiesto o de derecho". Íd.

### III.

A tenor con el derecho expuesto, los casos de acto ilegal a plena vista deben inducir sospecha de la posible existencia de un testimonio estereotipado. Sin embargo, al armonizar y analizar en conjunto las tres declaraciones juradas y la regrabación de la vista de supresión de evidencia, no puedo llegar a dicha conclusión respecto al testimonio prestado por el agente Espinal Torres.

Si bien es cierto que hay similitudes entre las cuatro declaraciones, también lo es que el agente Espinal Torres no se limitó a establecer los elementos mínimos necesarios para

sostener la comisión del delito. Del testimonio del agente Espinal Torres surgen suficientes detalles sobre: la hora en que comenzó su turno, quién le impartió instrucciones, la asignación del vehículo confidencial y su función como "puntero", la identidad del agente que lo acompañó situó geográficamente el lugar de la vigilancia y la distancia de observación, y describió físicamente al acusado y su vestimenta. En cuanto al desarrollo de la vigilancia y la posterior intervención hasta llegar al arresto, detalló dónde se estacionó y hacia dónde movió su vehículo, las comunicaciones con el sargento, describió la ruta de persecución, menciona que el acusado brincó el bonete y luego una verja, identifica quién logró detenerlo eventualmente, especificó la evidencia ocupada y la posterior prueba de campo. Como se podrá notar, el testimonio del agente Espinal Torres contiene suficientes detalles que individualizaron el suceso, por lo que superó el alegado carácter estereotipado que le pretende dar la defensa.

A pesar de que las declaraciones juradas contienen elementos comunes, y que al tratarse de un acto ilegal y a plena vista se activa el deber de revisar con mayor rigurosidad el testimonio, **examinado en su totalidad,** no se puede caracterizar como uno "flaco y descarnado" como para superar la apreciación del foro primario. Además, el uso de variaciones de la frase "flaco, ¿cuánto necesitas?" no es, por sí solo, suficiente para socavar la credibilidad del testimonio aquilatado por el foro de instancia.

En suma, no se trata de un relato que se limite a establecer mecánicamente los elementos mínimos del delito sin detalles que lo refuercen. Así, en ausencia de elementos que faculten nuestra intervención con tal apreciación de la prueba testifical, estoy conforme con nuestro dictamen.

Camille Rivera Pérez
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Osbiel Carmona Rodríguez<br><br>Peticionario | CC-2026-0538 |

Voto Particular Disidente emitido por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 7 de agosto de 2026.

Pocos casos ilustran mejor el concepto del "testimonio estereotipado" que el de epígrafe. Y es que el testimonio presentado por el Estado, en el presente caso, para rebatir la presunción de inconstitucionalidad que reviste una incautación sin una orden previa, no sólo adolece, intrínsecamente, de los rasgos de una declaración trillada y preconcebida a fin de probar los elementos mínimos para sostener una ocupación sin orden y una denuncia para ciertos delitos; sino que, al evaluarse en conjunto con, al menos, otras tres (3) declaraciones juradas vertidas, en otros casos, por el mismo agente del orden público encargado de la investigación aquí en controversia, dicho testimonio se reduce a la expresión más burda de la razón por la cual este Alto Foro, desde hace ya más de cincuenta (50) años, ha exigido descartarlo.

"Flaco, ¿cuánto necesitas?", dice, presuntamente, casi todo aquel cuyas manos terminan en las esposas del oficial de la Policía que aquí intervino. No importa el día, la hora o el lugar, pareciera que casi todas las personas arrestadas por el referido agente del orden público pecan de la misma manía de

llevar, -- específicamente, en la mano izquierda --, alguna especie de envoltorio con cocaína en su interior, mientras este último, vestido de civil, pulula las inmediaciones de algún "conocido punto de drogas".

**Conocida por demás es la máxima de que "[l]os jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería".** (Énfasis suplido). *Pueblo v. Luciano Arroyo*, 83 DPR 573, 582 (1961). Lo que quizás no sea tan conocido es que el precitado caso, que motivó tan citada expresión, versó sobre circunstancias idénticas a las del presente. Veamos.

## I.

En extrema síntesis, el caso de marras tiene su origen allá para el 8 de julio de 2025, cuando, por hechos presuntamente ocurridos el día antes, el Estado presentó dos (2) denuncias en contra del Sr. Osbiel Carmona Rodríguez (en adelante, "señor Carmona Rodríguez"), siendo una de ellas por el delito grave de posesión de sustancias controladas con la intención de distribuirlas. Tras las correspondientes determinaciones de causa probable y acusación, el 30 de diciembre de 2025, el señor Carmona Rodríguez presentó, ante el Tribunal de Primera Instancia, una *Moción de supresión de evidencia al amparo de la Regla 234 de Procedimiento Criminal*.

Lo anterior, bajo un planteamiento de que la evidencia obtenida fue producto de un registro ilegal, sin previa orden judicial y mediante una declaración estereotipada. En atención a tal solicitud, el 9 de febrero de 2026, el foro primario

celebró una vista evidenciaria, en la que el Estado presentó únicamente el testimonio del oficial aquí involucrado.

En esencia, el referido agente del orden público declaró, bajo juramento, que, el 7 de julio de 2025, mientras realizaba una vigilancia en un "conocido punto de drogas" en San Juan, -- en vestimenta civil, debidamente identificado y bajo la supervisión de un sargento --, observó a un individuo que tenía, en su mano izquierda, una bolsa plástica transparente que contenía varias bolsitas con lo que aparentaba ser cocaína, y que, al acercarse, el hombre le dijo: "Flaco, ¿cuánto necesitas?". Acto seguido, según su testimonio, se identificó como policía, tras lo cual el individuo le tiró la bolsa en la cara y salió corriendo, antes de que fuera eventualmente arrestado, mediante las debidas advertencias de ley.

A raíz de tal testimonio, la defensa del señor Carmona Rodríguez contrainterrogó al oficial que aquí intervino a los efectos de corroborar si era cierto, o no, que, en las declaraciones juradas que él realizaba en los casos de drogas, siempre hacía un relato muy similar. Frente a esa interrogante, el referido agente del orden público contestó en la negativa, debido a que, según éste, todas sus declaraciones eran diferentes. También negó que hubiese algunos aspectos de sus relatos que fuesen similares entre sí.

En vista de las mencionadas respuestas, y a modo de impugnación, la representación legal del señor Carmona Rodríguez procedió a mostrarle, al mencionado oficial, tres (3) declaraciones juradas que él habría hecho antes en otros

casos de drogas.[1] Al examinar, en conjunto, las cuatro (4) declaraciones aquí bajo estudio, surge que las mismas son muy similares, incluso idénticas, en ciertos aspectos.

Es decir, dichas declaraciones juradas contienen exactamente el mismo lenguaje, *ad verbatim*, respecto a: (1) su vestimenta civil; (2) estar debidamente identificado; (3) estar bajo la supervisión de un sargento; (3) la impartición de instrucciones sobre un plan de trabajo para intervenir en lugares de alta incidencia criminal; (4) la asignación de un vehículo confidencial; (5) estar vigilando un conocido punto de drogas; y (6) verbalizar las debidas advertencias de ley.

**Sin embargo, lo que realmente resulta sorprendente y particularmente revelador es que, en tres (3) de las cuatro (4) declaraciones, las personas arrestadas, -- en lugares y días distintos --, supuestamente llevaban un envoltorio de cocaína en su mano izquierda; y en todas ellas los arrestados verbalizaron al oficial, justo antes de su aprehensión, alguna variación de la frase: "Flaco, ¿cuánto necesitas?".[2]**

A pesar de lo anterior, el 4 de marzo de 2026, el Tribunal de Primera Instancia emitió una *Resolución*, mediante la cual

---

[1] Conviene aquí recordar que la Regla 802(a) de las Reglas de Evidencia, 32 LPRA Ap. VI, excluye de la definición de prueba de referencia inadmisible aquellas declaraciones anteriores de la persona declarante que sean inconsistentes con el testimonio que ésta preste durante el juicio o vista, y que hayan sido dadas bajo juramento y so pena de perjurio. Por lo tanto, habiendo el oficial negado que hubiese similitud entre su relato actual y los que él ha brindado anteriormente en otros casos de drogas, la defensa del señor Carmona Rodríguez podía presentar en evidencia dichas declaraciones juradas anteriores, a las que hizo referencia, para impugnar el testimonio ofrecido en la vista evidenciaria de autos.

[2] **Las versiones de la expresión, atribuidas por el agente a personas distintas arrestadas por éste, fueron las siguientes: (1) "Flaco, ¿cuánto necesitas?"; (2) "¿Cuánto quieres, flaco?"; (3) "¿Cuánto necesitas, flaco?"; y (4) "Flaco, ¿cuánto necesitas?".**

denegó la solicitud de supresión de evidencia del señor Carmona Rodríguez. Ello, al concluir que las declaraciones juradas vertidas por el oficial en otros casos de drogas no guardaban relación con el de autos; así como que, a lo sumo, la única coincidencia entre las cuatro (4) declaraciones era la de referirse al mencionado oficial como "flaco", lo que se podría deber a su complexión física.

Igual suerte tuvo el señor Carmona Rodríguez cuando, el 25 de junio de 2026, el Tribunal de Apelaciones emitió una *Resolución* mediante la cual denegó su *Petición de certiorari*. A través de esta última, éste había pedido revisión del dictamen del foro primario.

Así las cosas, el 16 de julio de 2026, el señor Carmona Rodríguez compareció ante nos mediante una *Petición de certiorari*. En ésta, esencialmente, nos solicita revocar la determinación del Tribunal de Primera Instancia, a los efectos de declarar que procedía la supresión de la evidencia aquí incautada sin una orden judicial previa, toda vez que el Estado no pudo rebatir su presunción de inconstitucionalidad, al descansar únicamente en un testimonio estereotipado, contrario a lo que nuestra jurisprudencia ha exigido durante décadas.

Posteriormente, el 3 de agosto de 2026, y en vista de que el foro primario pautó el comienzo del juicio para el 10 de agosto de 2026, el señor Carmona Rodríguez compareció nuevamente ante nos mediante una *Moción en auxilio de jurisdicción y solicitud de paralización de los procedimientos*. Empero, evaluados sus señalamientos, una

mayoría de esta Sala de Verano les ha cerrado el paso a los planteamientos de este último. De dicho proceder, respetuosamente, disentimos. Explicamos por qué.

II.

Como es sabido, la Constitución de los Estados Unidos de América y la Constitución del Estado Libre Asociado de Puerto Rico protegen a todas las personas contra registros y allanamientos irrazonables, a raíz de intromisiones arbitrarias del Estado en sus hogares, documentos, efectos personales y su cuerpo. Enmda. IV, Const. EE. UU., LPRA, Tomo 1; Art. II, Sec. 10, Const. ELA, LPRA, Tomo 1. En virtud de tales garantías fundamentales, se ha requerido, como regla general, que el Estado obtenga una orden judicial antes de efectuar un registro o allanamiento en los lugares y efectos antes señalados, so pena de que la inobservancia de tal exigencia activará una presunción de que la actuación gubernamental ha sido irrazonable e inconstitucional. *Riley v. California*, 573 U.S. 373, 382 (2014); *Pueblo v. Báez López*, 189 DPR 918, 930 (2013); *Blassini et als. v. Depto. Rec. Naturales*, 176 DPR 454, 462 (2009).

**Empero, como tales garantías de rango constitucional sólo proscriben aquellas actuaciones que sean irrazonables, se han reconocido ciertas excepciones al mencionado requisito de obtener una orden judicial previa al momento de realizar un registro o allanamiento, entre las que se encuentran la de evidencia encontrada a plena vista y la de evidencia arrojada.** *Pueblo v. Apolinar Rondón*, 2025 TSPR 113, 216 DPR __ (2025)

(Colón Pérez, opinión disidente); *Pueblo v. Ortiz Zayas*, 122 DPR 567 (1988); *Pueblo v. Lebrón*, 108 DPR 324 (1979); *Pueblo v. Dolce*, 105 DPR 422 (1976). **Son, precisamente, las precitadas excepciones las que han levantado, en la jurisprudencia de este Tribunal, una mayor preocupación respecto al concepto del "testimonio estereotipado" al que hemos hecho referencia.** *Pueblo v. Camilo Meléndez*, 148 DPR 539 (1999); *Pueblo v. González del Valle*, 102 DPR 374 (1974); *Pueblo v. Rosado Rosado*, 100 DPR 905 (1972); *Pueblo v. Ayala Ruiz*, 93 DPR 704 (1966); *Pueblo v. Maysonet Laureano*, 90 DPR 497 (1964); *Pueblo v. Luciano Arroyo*, *supra*. **Ello así, debido a que esas modalidades son las que los agentes del orden público utilizan con mayor frecuencia para justificar incautaciones sin una orden judicial previa, amparándose en un testimonio trillado, inverosímil, preconcebido, ensayado, esquemático, formulario o descarnado, que tienda a probar los elementos mínimos requeridos para activar tales excepciones y así rebatir la presunción de inconstitucionalidad de la que adolecen.** *Íd.*

Fue, precisamente, en el precitado escenario, donde nació la famosa frase de que los jueces no debemos creer lo que nadie más creería, a la que hemos hecho referencia al comienzo de nuestro escrito. En *Pueblo v. Luciano Arroyo*, *supra*, este Alto Foro se enfrentó a una situación en la que, durante una vista de supresión de evidencia en un caso de la llamada "bolita" o juego ilícito, surgió que el agente del orden público que testificó para justificar la incautación allí en controversia había consignado, durante el año anterior, relatos muy

similares en otras tres (3) declaraciones juradas por ese mismo delito. Al igual que en el caso de marras, a pesar de la similitud sustancial entre las cuatro (4) declaraciones juradas allí en controversia, el referido agente del orden público negó haber hecho relatos semejantes en los casos de "bolita" y el Tribunal de Primera Instancia denegó la moción de supresión de evidencia.

**Ahora bien, al tener la oportunidad de acercarse a dicha controversia, este Tribunal puntualizó que, "desde hace algún tiempo, nos preocupa el hecho de que las declaraciones juradas que sirven de base a muchas órdenes de allanamiento que nos ha correspondido examinar, principalmente aquellas que se expiden en casos de 'bolita', contienen unas expresiones estereotipadas".** (Énfasis suplido). *Pueblo v. Luciano Arroyo*, *supra*, pág. 581. **Pero, más allá de esa preocupación, en aquella ocasión, este Alto Foro destacó que el problema es "mucho más grave", puesto que, además de estar presente el "primer elemento de la improbabilidad" inherente del testimonio respecto al mismo patrón estereotípico de conducta, también "se comprueba que dicho agente, durante el año anterior, había jurado declaraciones prácticamente idénticas en los únicos tres casos en los que había hecho tales gestiones".** (Énfasis suplido). *Íd.*, pág. 582.

Ante esas circunstancias, en *Pueblo v. Luciano Arroyo*, *supra*, este Tribunal descartó darle credibilidad a ese tipo de testimonio, particularmente ante una ausencia de otra evidencia independiente que lo compruebe, por lo que revocó el

dictamen recurrido y absolvió al acusado. Así también lo hemos entendido en casos posteriores, mediante los cuales hemos advertido que la naturaleza de tales testimonios exige mirarlos con recelo y suspicacia, siendo imperativo descartarlos cuando sean irreales o inverosímiles. *Pueblo v. Acevedo Estrada*, 150 DPR 84 (2000); *Pueblo v. Camilo Meléndez*, *supra*; *Pueblo v. González del Valle*, *supra*; *Pueblo v. Rosado Rosado*, *supra*; *Pueblo v. Ayala Ruiz*, *supra*; *Pueblo v. Maysonet Laureano*, *supra*. El caso que hoy nos ocupa es otro de ellos.

## III.

Así pues, a la luz de la normativa antes discutida, -- y, distinto de como lo sentenciaron los foros recurridos; y, con su silencio, una mayoría de esta Sala de Verano --, somos del criterio de que, ni la complexión física del oficial aquí envuelto, ni los detalles que permiten diferenciar una declaración jurada de las otras, resultan suficientes para imprimirle credibilidad a su testimonio o para despojar el mismo de su evidente naturaleza estereotipada. La controversia de autos no se trata de la mera narración de conducta delictiva similar o típica. **Se trata de un patrón en el que ha incurrido un agente del orden público de incluir, en sus declaraciones juradas en casos de drogas, hechos que, -- al examinarse en conjunto --, resultan extremadamente improbables o inverosímiles (como que sus arrestados, -- en lugares y días distintos, y sin conocerse entre sí --, lleven un envoltorio de cocaína en su mano izquierda y, tan pronto se les acerca, le digan alguna versión de "Flaco, ¿cuánto quieres?").** Ello,

siendo el referido testimonio la única evidencia que presentó el Estado para rebatir la presunción de inconstitucionalidad de la que adolece la ocupación controvertida, fallando así en el requisito de producir evidencia adicional e independiente que permita corroborarlo.

**Las garantías fundamentales aquí envueltas exigen un mayor grado de esmero y puntillosidad por parte de los agentes del orden público a la hora de testificar sobre los hechos particulares que permiten prescindir, -- por vía de excepción --, del requisito constitucional de una orden judicial previa a la realización de un registro o allanamiento. De igual modo, las juezas y los jueces, -- como guardianes de los derechos esenciales --, no debemos de incurrir en la ingenuidad o permisividad inocente de la que advertía el entonces Juez Asociado señor Serrano Geyls a través de su tan conocida cita de *Pueblo v. Luciano Arroyo*, *supra*.**

IV.

Es, pues, por las razones antes expuestas, que entendemos que se le debió dar paso a la *Moción en auxilio de jurisdicción y solicitud de paralización de los procedimientos*, así como a la *Petición de certiorari* del señor Carmona Rodríguez. Como ese no fue el curso de acción seguido por una mayoría de esta Sala de Verano, respetuosamente, disentimos.

Ángel Colón Pérez
Juez Asociado
